UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


H S STANLEY, JR.,                                    CIVIL ACTION
*In his capacity as Trustee of the Bankruptcy*
*Estate of Gary Eugene Hale*

**versus**                                           No.  02-1235

CLARE W. TRINCHARD, Esq., *et al.*                   SECTION: I/1


<u>ORDER AND REASONS</u>

Before the Court is defendant's, Northwestern National Insurance Company of Milwaukee, Wisconsin ("NNIC"), motion for summary judgment.[1]  For the following reasons, NNIC's motion is **DENIED.**

<u>BACKGROUND</u>

The facts of this case were articulated by the U.S. Fifth Circuit Court of Appeals:

*A. Background*

The instant case stems from the criminal investigation and prosecution of Gerald Burge [("Burge")] for the murder of Douglas Frierson in 1980.  Burge was indicted for and convicted of Frierson's murder based in part on an investigation conducted by [Gary Eugene] Hale [("Hale")] when he was a detective in the St. Tammany Parish (Louisiana) Sheriff's Office ("the Sheriff's Office").[1]  Several years after Burge was convicted, however, potentially exculpatory evidence was discovered

---

[1]Rec. Doc. No. 395.

[1]Hale ended his employment with the sheriff's office sometime in the summer of 1981.

(specifically, several of Hale's investigative reports) that had not been disclosed to the defense at or before Burge's trial.  Burge was granted a new trial, which resulted in his acquittal on all charges.

While awaiting his new trial, Burge had filed a § 1983 civil suit ("the Burge litigation") against (1) the Sheriff's Office, (2) the St. Tammany Parish District Attorney's Office, and (3) various individuals within each agency, including Detective Hale, for conspiring to deprive Burge of his right to a fair trial by suppressing exculpatory evidence.[2]  Burge later added NNIC as a defendant for its role as the liability insurer of the Sheriff's Office during the first few years of the Frierson murder investigation.

*B. NNIC's Insurance Coverage*

In 1980, American Druggists' Insurance Company ("ADIC") issued a liability insurance policy ("the original ADIC policy") to the Louisiana Sheriff's Association.[3]  This policy was renewable for 12-month terms and (if renewed) would remain in effect until September 1, 1983.  It specified a coverage limit of $100,000 per occurrence.[4]  ADIC subsequently issued an amended policy ("the amended ADIC Policy"), which restated the same terms and coverage period as the original ADIC Policy but increased the coverage limit to $1,000,000.  The original ADIC Policy was marked "cancelled flat."  The amended ADIC Policy indicated in a notation on the Declarations Page and in an amending endorsement that the effective date for the new $1,000,000 coverage limit was September 1, 1981, not the original commencement date of September 1, 1980.  When ADIC became insolvent in 1986, its reinsurer, NNIC, assumed responsibility for any coverage under the ADIC policies pursuant to a "cut-through" reinsurance

---

[2]Burge's claims against the District Attorney's Office and individual prosecutors were dismissed on the basis of prosecutorial immunity.  *Burge v. Parish of St. Tammany*, 1994 WL 86694 (E.D. La. March 9, 1994), *aff'd on other grounds*, 187 F.3d 452 (5th Cir. 1999).  Burge voluntarily dismissed the Sheriff's Office as a defendant early in the case, but continued to pursue his claims against the Sheriff in his official capacity.

[3]The "Named Insureds" under the ADIC Policy were "each Sheriff [and his employees] of the Parishes of the State of Louisiana."

[4]For the purposes of this opinion, "coverage limit" will consistently refer to coverage limit *per occurrence*.

endorsement.[5]

In the Burge litigation, NNIC filed a motion for summary judgment seeking dismissal, because the ADIC policies' coverage ended on September 1, 1983, and Burge's alleged injury did not "occur" until he was indicted in November 1983, or possibly until he was convicted in 1986. NNIC also asked the court to rule that the coverage limit applicable to any misconduct by Hale was $100,000, as specified in the original ADIC Policy, because his employment with the Sheriff's Office ended in the summer of 1981, before the $1,000,000 coverage limit in the amended ADIC Policy went into effect on September 1 of that year.

The district court denied NNIC's motion, ruling that the issues raised by NNIC were "hotly disputed" and worthy of full development at trial.[6] The coverage issue centered on whether the ADIC policies' definition of a covered "occurrence" was broad enough to encompass all conduct related to the Frierson murder investigation, including both Hale's actions while he was employed as a detective with the Sheriff's Office and his post-employment conduct during Burge's murder trial in 1986. The coverage limit issue concerned, *inter alia*, whether (1) marking the original ADIC Policy "cancelled flat" indicated an intention to make the terms of the amended ADIC Policy effective retroactively,[7] or (2) the Louisiana Sheriff's Association had intended for the *original* ADIC Policy to provide a $1,000,000 coverage limit.[8]

*C. NNIC's Settlement with Burge*

---

[5] "[A] 'cut-through' clause is any term within a reinsurance agreement under which the reinsurer assumes liability towards the original insured in the event of the liquidation of the reinsured." Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 9:16 (3d ed.2006).

[6] The same district judge presided over both the Burge litigation and the instant case.

[7] "Canceled flat" is a term of art essentially meaning "void *ab initio*." *See, e.g., Highlands Ins. Co. v. Hobbs Group, L.L.C.*, 373 F.3d 347, 350 n. 4 (3d Cir. 2004) (discussing effect of "flat" cancellation of a surety bond); *Escobedo v. Estate of Snider*, 930 P. 2d 979, 985 (1997) ("[A]ccording to insurance industry usage, a 'cancellation' may under some circumstances be made 'flat,' meaning effective from the policy's inception, eliminating liability for either premiums due or losses incurred in the interim.").

[8] All of these coverage/coverage limits issues were [articulated] in a July, 2000 letter to NNIC from its counsel.

NNIC initially retained attorney Clare Trinchard to determine whether the ADIC policies provided coverage for the alleged misconduct of the Sheriff and his personnel. After receiving her review of the case, NNIC retained the Trinchard firm to represent the Sheriff, Hale, and NNIC in the Burge litigation. Later, after deciding to dispute coverage under the ADIC policies, NNIC instructed the Trinchard firm to continue representing the Sheriff and Hale individually but retained separate counsel to represent NNIC's interests.

In November, 2000, shortly before the Burge litigation was to be tried, the Trinchard firm and NNIC's counsel negotiated a partial settlement with Burge. In exchange for $75,000, Burge agreed to (1) release NNIC fully from all liability under the ADIC policies and (2) release the Sheriff and Hale from liability, except for punitive damages, for any conduct that occurred during the ADIC policies' coverage period (September 1, 1980 to September 1, 1983). Burge expressly reserved his right to pursue claims against the Sheriff and Hale for conduct that occurred outside of the coverage period as well as for punitive damages at any time.

In January 2001, on the advice of the Trinchard defendants, Hale consented to the Burge settlement and signed a separate "Release and Acknowledgment" absolving that firm's former client, NNIC, from "any and all liability" under the ADIC policies, including "claims for indemnification, defense, legal fees and costs, [and] bad faith." The release itself did not specify the terms of the Burge settlement, particularly Burge's reservation of his right to sue Hale for conduct occurring outside of the ADIC policies' coverage period. After obtaining Hale's release of NNIC, the Trinchard defendants terminated their representation of Hale and the Sheriff.

*D. The Burge Trial and Hale's Bankruptcy Proceedings*

Burge's remaining claims against the Sheriff and Hale were tried in May 2001. The Sheriff was represented by other counsel, but Hale decided to represent himself, possibly believing that the only liability he faced post-settlement was for punitive damages, which he believed to be, at most, a remote possibility. After a jury verdict for Burge, the court entered judgment against the Sheriff and Hale, awarding Burge more than $4,000,000 in compensatory damages. The Sheriff appealed to [the Fifth Circuit, which] reversed the judgment against him. Hale, still unrepresented by counsel, did not appeal. The

judgment against Hale became final in September 2001.
     The following month, Burge forced Hale into
involuntary bankruptcy in Mississippi.  As the appointed
trustee of Hale's bankruptcy estate, Stanley filed the
instant action against the Trinchard defendants[9] and NNIC
in the district court in April 2002, alleging that (1)
the Trinchard defendants were negligent in their
representation of Hale and (2) NNIC breached its
fiduciary duty of good faith and fair dealing in its
settlement of the Burge litigation.  Hale was discharged
in the bankruptcy proceeding in December 2002, and
neither Stanley as trustee nor Burge as Hale's only
creditor contested the discharge.

*E. District Court Proceedings*

     The Trinchard defendants and NNIC each filed a
motion for summary judgment in the district court.  The
court granted both motions, concluding that (1) Hale's
bankruptcy discharge made it impossible for Stanley to
show that any damages resulted from the Trinchard
defendant's alleged malpractice and (2) Stanley did not
allege conduct by NNIC that would constitute a breach of
the insurer's duty of good faith and fair dealing under
Louisiana law.

*Stanley v. Trinchard*, 500 F.3d 411, 415-18 (5th Cir. 2007).

On February 17, 2006, Stanley filed a notice of appeal

challenging the district court's rulings with respect to the

Trinchard defendants' and NNIC's motions for summary judgment.[2]  On

September 13, 2007, the Fifth Circuit reversed the district court's

rulings with respect to those motions and remanded the above-

_____

     [9]Stanley later added as a defendant Leigh Ann Schell, an attorney employed
by Trinchard & Trinchard during the Burge litigation.  The district court
dismissed all claims against Schell as time-barred, and Stanley does not
challenge that ruling.

     [2]Rec. Doc. No. 366.

captioned matter to the district court[3] for further proceedings.[4]
*Id*. at 431.  On November 8, 2007, the above-captioned matter was
transferred to this Court.[5]

On January 31, 2008, NNIC filed this motion arguing that no
genuine issue of material fact exists with respect to Stanley's
claims against NNIC and, as such, NNIC is entitled to judgment as
a matter of law.[6]  Specifically, NNIC argues that:

(1) NNIC had no obligation to defend Hale after the November,
2000, settlement with Burge because the claims made against

---

[3]This case was originally remanded to Section "E" of this Court.

[4]In reversing the district court's ruling with respect to the Trinchard
defendants' motion, the Fifth Circuit held that "at the time bankruptcy
proceedings commenced, Hale had incurred a legal injury - in the form of an
adverse money judgment - sufficient to allow Stanley to assert a legal
malpractice claim against the Trinchard defendants on behalf of Hale's bankruptcy
estate *and* that Hale's subsequent discharge from personal liability for that
judgment had no effect on the right and duty of the trustee to pursue that
claim." *Stanley v. Trinchard*, 500 F.3d 411, 425 (5th Cir. 2007).  "The district
court erred, therefore, in dismissing Stanley's legal malpractice claim against
the Trinchard defendants based on its flawed conclusion that Hale suffered no
compensable injury." *Id*.  The Fifth Circuit further held that Stanley, as the
trustee of Hale's bankruptcy estate, did not waive the bankruptcy estate's claims
against the Trinchard defendants simply because Stanley failed to object to
Hale's discharge from personal liability. *Id*. at p. 426.
    In reversing the district court's ruling with respect to NNIC's motion, the
Fifth Circuit held that "the bases for an *insured's* cause of action for a breach
of the implied covenant of good faith and fair dealing are not limited to the
prohibited acts in [La. Rev. Stat. Ann. § 22:1220(B)]." *Id*. at p. 427 (citing
*Theriot v. Midland Risk Ins. Co.*, 694 So. 2d 184, 188 (La. 1997).  The Fifth
Circuit explained that, in light of the fact that NNIC was Hale's insurer, and
Stanley, as Hale's bankruptcy trustee, stands in Hale's shoes as the insured,
Stanley's "cause of action against NNIC for breach of the covenant of good faith
and fair dealing is not limited by [La. Rev. Stat. Ann. § 22:1220]." *Id*. at pp.
427-28.  The Fifth Circuit concluded, however, that it could not determine
whether NNIC's conduct constituted a breach of its duty of good faith and fair
dealing because "the parties' disagreement on [that] issue is intertwined with
their unresolved factual disputes over the ADIC policy limits and coverage
period." *Id*. at p. 429.

[5]Rec. Doc. No. 382.

[6]Rec. Doc. No. 395.

Hale were for misconduct that occurred outside of the policy's coverage period, and there was no contractual obligation or duty to defend once the policy limits had been exhausted by virtue of settlement or judgment;

(2) NNIC had no obligation to defend Hale because the claims made against him were for intentional acts, which are excluded by the policy's definition of "occurrence;" and

(3) NNIC's limit for the 1980-1981 policy year was $100,000.00, not $1,000,000.00.[7]

## THE AMENDED ADIC POLICY[8]

---

[7]Rec. Doc. No. 395-2, pp. 5-6.

[8]Stanley argues that the Court should deny NNIC's motion because NNIC has not provided a certified copy of the amended ADIC policy. Rec. Doc. No. 409, pp. 1-3. Stanley claims that he has asked NNIC to either admit to the authenticity of the policy submitted herein or provide Stanley with a certified copy thereof; however, NNIC failed to do either. *Id*. Stanley asserts that, as a result of not having a certified copy of the amended ADIC policy, neither the parties, nor the Court, can be certain that the policy forms and endorsements supporting and opposing NNIC's motion are accurate, complete, or comprehensive. *Id*. at p. 2. Stanley argues that "[w]hen an insurer is unable to produce a certified copy of the policy and the exact contents of the policy are in question, summary judgment based on the exclusions in the policy is impossible because the contents of the policy itself are a disputed material fact." *Id*.

NNIC argues that, in light of the fact that ADIC was the primary insurer under the policy and NNIC was only a cut-through endorser, it is not within NNIC's power to produce a certified copy of the amended ADIC policy. Rec. Doc. No. 426, p. 5. However, NNIC asserts that the copy of the amended ADIC policy attached to its motion for summary judgment is complete, and there is no reason to doubt its authenticity. *Id*.

Having reviewed the record and the parties' arguments, the Court finds that there is no genuine issue of material fact concerning the authenticity of the amended ADIC policy. Stanley fails to present sufficient summary judgment evidence indicating that the "exact contents" of the amended ADIC policy provided by NNIC are actually in dispute. In fact, Stanley fails to identify, with any level of specificity, the provisions that Stanley asserts may be incomplete or inaccurate. Accordingly, the Court shall not deny NNIC's motion based solely on Stanley's skepticism and mere allegation that the contents of the policy presented by NNIC may be incomplete or inaccurate.

The amended ADIC policy (the "policy")[9] provided the Louisiana Sheriff's Association and its employees with comprehensive general liability insurance for "bodily injury,"[10] "property damage,"[11] or "personal injury" caused by an "occurrence."

An "occurrence," as defined by amendatory endorsement no. 4 of the policy, means:

> [A]n accident, including continuous or repeated exposure to conditions, which results in injury or damages neither expected nor intended from the standpoint of the insured arising out of the performance of official duties while operating within the law by any duly elected or appointed insured hereunder.[12]

According to the policy, an "occurrence" can also "be a happening or series of happenings arising out of one event taking place during the policy period."[13]   The policy further provides that the

---

[9]Pursuant to the amended ADIC policy, NNIC was obligated to indemnify the Insured, his Executors, Administrators, and Assigns against all sums which the Insured shall become legally liable to pay with respect to claims against the Insured for loss or damage, as defined in the policy, occurring during the policy period.  Rec. Doc. No. 409-5, p. 2.

[10]The term "bodily injury," as defined by the policy, means:
Bodily injury, sickness, or disease sustained by any person accidentally caused by any act of the Insured while acting within the scope of his duties as a Law Enforcement Officer; or Tax Collector; "damages" includes damages for death and for care and loss of services resulting from bodily injury.
*See* Rec. Doc. No. 409-5, p. 2, Section I, Coverage A "Bodily Injury."

[11]The term "property damage," as defined by the policy, means:
To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay for damage to tangible property including loss of use thereof caused by accident and arising out of the Insured's operations.
*See* Rec. Doc. No. 409-5, p. 2, Section I, Coverage B "Property Damage."

[12]*See* Rec. Doc. No. 409-5, p. 17, Amendatory Endorsement No. 4, para. 1, "Occurrence."  The effective date of Amendatory Endorsement No. 4 was September 1, 1980.  *Id.*

[13]*Id.*

-8-

word "incident" may be substituted for the word "occurrence."[14]  The
term "incident" is defined by the policy as "the initial act or
acts attributable to a specific alleged crime or complaint
resulting in action by the insured, which alleged crime or
complaint can be fixed as to time and place and any subsequent acts
which directly relate to or arise out of the original alleged crime
or complaint."[15]

In this case, the only injuries alleged to have been caused by
an "occurrence," as the term is used in the policy, are the
"personal injuries" suffered by Burge as a result of Hale's
conduct.[16]  The policy defines "personal injury" as:

> [F]alse arrest, erroneous service of civil papers, false
> imprisonment, malicious prosecution, libel, slander,
> defamation of character, wrongful entry, wrongful
> eviction, invasion of privacy, deprivation of rights . .
> ., violation of property rights and, if committed while
> making or attempting to make an arrest or while resisting
> an overt attempt to escape by a person under arrest,
> assault and battery, ***provided that no act shall [be]
> deemed to be or result in personal injury unless
> committed or alleged to have been committed during the
> currency of this policy*** arising out of the performance of
> the duties under the color of law of any duly elected or
> appointed office of sheriff or deputy sheriff of any
> Parish of the State of Louisiana as stipulated herein.[17]

In the event that a third-party files a lawsuit against an

---

[14]*Id.*

[15]*Id.*

[16]Rec. Doc. No. 395-6, "Burge's Second Supplemental Complaint."

[17]Rec. Doc. No. 409-5, pp. 2-3, Section I, Coverage C "Personal Injury"
(emphasis added).

insured seeking damages on account of personal injury, the policy provides that "the Company," in this case NNIC, "shall have the right and the duty to defend" against the lawsuit and "may make such investigation and settlement of any claim or [lawsuit] as it deems expedient."[18]  The policy imposes the duty to defend "even if any of the allegations of the [lawsuit] are groundless, false or fraudulent."[19]  Nevertheless, "the Company shall not be obligated to pay any claim or judgment or to defend any [lawsuit] after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements."[20]

## LAW AND ANALYSIS

## I. STANDARDS OF LAW

### A. RULE 56 STANDARD

Summary judgment should be rendered if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material

---

[18]*See* Rec. Doc. No. 409-5, p. 3, Section II.

[19]*Id.*

[20]*Id.*

fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 266 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Id.; Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986) (internal quotation omitted).

Once the party seeking the summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). The showing of a genuine issue is not satisfied by creating some metaphysical doubt as to the material facts by conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).  Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue.  *Id.*  The non-moving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  *Hunt v.*

-11-

*Cromartie*, 526 U.S. 541, 552, 119 S. Ct. 1545, 1551-52, 143 L. Ed. 2d 731 (1999) (internal quotation and citation omitted) (alternation in original).

**B. DUTY TO DEFEND**

Pursuant to Louisiana law,[21] "[a] liability insurer's duty to defend and the scope of its coverage are separate and distinct issues." *Mossy Motors, Inc. v. Cameras Am.*, 898 So. 2d 602, 606 (La. App. 4 Cir. 2005) (citing *Dennis v. Finish Line, Inc.,* 636 So. 2d 944, 946 (La. App. 1 Cir. 1994)). It is well-recognized that "the obligation of a liability insurer to defend suits against its insured is generally broader than its obligation to provide coverage for damages claims." *Id.* (citing *Steptore v. Masco Constr. Co., Inc.*, 643 So. 2d 1213, 1218 (La. 1994)). "The issue of whether a liability insurer has the duty to defend a civil action against its insured is determined by application of the 'eight corners rule,' under which an insurer must look to the 'four

---

[21]Because the Court's subject matter jurisdiction in this case is premised upon diversity of citizenship, state law applies to the substantive issues before the Court. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (*citing Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188, 1194 (1938)). "In determining which state's substantive law controls, the court applies the choice-of-law rules of the forum state." *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97, 61 S. Ct. 1021-22, 85 L. Ed. 1477, 1480-81 (1941)). The ADIC policies were issued in Louisiana. Because this action involves these insurance policies, Louisiana substantive law governs. *See Am. Int'l Specialty Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003) ("Louisiana choice of law rules dictate, that in this action involving the interpretation of insurance policies issued in Louisiana, Louisiana substantive law governs our decision."); *Ins. Co. of N. Am. v. W. of Eng. Shipowners Mut. Ins. Ass'n*, 890 F. Supp. 1302, 1306 (E.D. La. 1995) (Vance, J.) ("Louisiana law is the obviously applicable state law since the [insurance] policies were provided to a Louisiana insured in the State of Louisiana.").

-12-

corners' of the plaintiff's petition and the 'four corners' of [the insurer's] policy to determine whether it owes that duty." *Id.* (citing *Vaughn v. Franklin*, 785 So. 2d 79, 84 (La. App. 1 Cir. 2001)); *see also Henly v. Phillips Abita Lumber Co.*, 971 So. 2d 1104, 1109 (La. App. 1 Cir. 2007); *see Lamar Adver. Co. v. Cont'l Cas. Co.*, 396 F.3d 654, 660 (5th Cir. 2005).

### (1). PLAINTIFF'S PETITION

With respect to a plaintiff's petition, "the factual allegations of the petition must be liberally interpreted to determine whether they set forth grounds which raise even the possibility of liability under the policy." *Mossy*, 898 So. 2d at 606. "[T]he test is not whether the allegations unambiguously assert coverage, but rather whether they do not unambiguously exclude coverage." *Id.* "[E]ven though a plaintiff's petition may allege numerous claims for which coverage is excluded under an insurer's policy, a duty to defend may nonetheless exist if there is at least a single allegation in the petition under which coverage is not unambiguously excluded." *Id.* (citing *Employees Ins. Representatives, Inc. v. Employers Reinsurance Corp.*, 653 So. 2d 27, 29 (La. App. 1 Cir. 1995)).[22] "We look only to the *factual*

---

[22]If a complaint contains even one allegation that is not unambiguously excluded from coverage under the policy, "'the insurer has a duty to accept defense of the entire lawsuit, even though other claims in the complaint fall outside of the policy's coverage.'" *Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 523 (5th Cir. 2005) (quoting *Montgomery Elevator Co. v. Bldg. Eng'g Servs. Co.*, 730 F.2d 377, 382 (5th Cir. 1984)); *see also Mossy Motors, Inc. v. Cameras Am.*, 898 So. 2d 602, 606 (La. App. 4 Cir. 2005).

-13-

allegations in the complaint, however; 'statements of conclusions in the complaint that are unsupported by factual allegations will not trigger a duty to defend.'" *Coleman v. Sch. Bd. Of Richland Parish*, 418 F.3d 511, 523 (5th Cir. 2005) (*quoting Jensen v. Snellings*, 841 F.2d 600, 612 (5th Cir. 1988)).

### (2). <u>INSURANCE POLICIES</u>

With respect to insurance policies, Louisiana law provides that an insurance policy is a contract between the parties and should be construed using the general rules of contract interpretation set forth in the Louisiana Civil Code. *Bonin v. Westport Ins. Corp.*, 930 So.2d 906, 910 (La. 2006); *see also Coleman*, 418 F.3d at 516. Just as with contracts, the judiciary's role in interpreting insurance policies is to ascertain the common intent of the parties. *Coleman*, 418 F.3d at 516; *Bonin*, 930 So.2d at 910; *see also* La. Civ. Code Ann. 2045.

The words used in an insurance policy must be given their generally prevailing meaning. *Coleman*, 418 F.3d at 516; *Bonin*, 930 So.2d at 910; *see* La. Civ. Code Ann. 2047. Where these words are clear and explicit and lead to no absurd consequences, the policy's meaning and the parties' intent *must be sought within the four corners of the document* and cannot be explained *or* contradicted by extrinsic evidence. *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 440 (5th Cir. 2002) (emphasis added); *Coleman*, 418 F.3d at 518 (explaining that when the language of an insurance policy is clear,

-14-

courts lack the authority to change or alter its terms under the guise of interpretation).  Each provision of an insurance policy "must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Coleman*, 418 F.3d at 516; (quoting La. Civ. Code Art. 2050).

Insurance policies should not be interpreted "in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Bonin*, 930 So.2d at 910-11; *Coleman*, 418 F.3d at 516.  Should ambiguies remain in an insurance policy after applying the general rules of contract interpretation, they are to be strictly construed against the insurer and in favor of coverage. La. Civ. Code Art. 2056. However, an insurance policy is ambiguous only when it is susceptible to two or more interpretations and each of the alternative interpretations is reasonable. *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).  An ambiguity is not created simply because one of the parties to an insurance policy can create a dispute in hindsight.  *Id.*

II. **DISCUSSION**

    A. **WHETHER HALE'S CONDUCT OCCURRED DURING THE AMENDED ADIC POLICY'S COVERAGE PERIOD**

As previously stated, the amended ADIC policy provides that an act or occurrence shall not result in a "personal injury," and

thereby trigger the duty to defend, unless the act or occurrence takes place during the life of the policy and arises out of the performance of duties under color of law.[23]

NNIC argues that it had no obligation to defend Hale in the Burge litigation because Burge's claims against Hale were based upon misconduct that occurred outside of the policy period, i.e., Hale's subornation of perjury and withholding of exculpatory statements during Burge's criminal trial in 1986.[24] NNIC contends that its duty to defend Hale in the Burge litigation would only have been triggered had Burge suffered damage as a result of covered actions taken by Hale prior to September 1, 1983, during the policy period.[25] NNIC argues that, in light of the fact that Burge did not sufficiently allege that Hale engaged in misconduct during the policy period, NNIC's duty to defend was never triggered.[26]

---

[23]Rec. Doc. No. 409-5, pp. 2-3, Section I, Coverage C "Personal Injury."

[24]Rec. Doc. No. 395-2, p. 14.

[25]*Id*. at p. 11.

[26]*Id*. at pp. 11-12.   NNIC argues that the following acts, which were alleged in Burge's second supplemental and amending complaint, were insufficient to trigger NNIC's duty to defend under the amended ADIC policy:
(1) Hale was appointed to conduct the investigation of the murder of Douglas Frierson;
(2) As a part of that investigation, Hale took the statement of Jean Frierson, mother of the decedent, on the same date of the murder.  At that time, Mrs. Frierson said that at no time had she seen her son in the company of Gerald Burge;
(3) Only a few months after the investigation began, Hale had an affair with, and eventually married, Glenda Frierson, the murder victim's sister.  Despite this, Hale was not taken off the case by the State of Louisiana, the Sheriff's Office, and/or the District Attorney's Office;
(4) During the course of the investigation, Hale also took statements from Joellen Preswood and Rhonda Spier who separately indicated to Hale that they had overheard an individual named Joe Pierson, on more than one occasion, claiming

-16-

Stanley counters NNIC by arguing that Burge's false arrest in 1980 was the "single occurrence" which set in motion all damages suffered by Burge, including his malicious prosecution and wrongful imprisonment in 1986.[27]  As such, Stanley argues that all events that occurred with respect to Burge from 1980 forward should be considered a single occurrence under the amended ADIC policy.[28]  In support of this argument, Stanley references the amended ADIC policy, which provides that an "'occurrence' can be a happening or series of happenings arising out of one event taking place during the policy period."[29]

During the most recent appeal of this case, the Fifth Circuit agreed with Judge Livaudais' determination that there are unresolved genuine issues of material fact concerning whether Hale's misconduct, which caused Burge to sustain compensable injuries, occurred during the amended ADIC policy's coverage period.[30]  *See Stanley*, 500 F.3d at 429.

---

that "he was the one who had blown Douglas Frierson's head off;" and
  (5) Despite this information, Burge was arrested for the murder of Frierson.  The original second degree murder indictment was returned three years after Frierson's death charging both Burge and Pierson with murder.

Rec. Doc. No. 395-6, pp. 3-4, paras. 7-11.
  Although Burge does not specifically allege the date on which the above-referenced events occurred, he does indicate that they occurred soon after Douglas Frierson's murder on or about October 17, 1980.  *Id.* at p. 3, para. 5.

[27]Rec. Doc. No. 409, p. 7.

[28]*Id.*

[29]*Id.; see also* Rec. Doc. No. 409-5, p. 17, "Amendatory Endorsement No. 4."

[30]In the Burge litigation, Judge Livaudais concluded that there was a genuine issue of material fact concerning the amended ADIC policy's coverage period.  *Stanley v. Trinchard*, 500 F.3d 411, 416 (5th Cir. 2007).  "The coverage issue centered on whether the ADIC policies' definition of a covered 'occurrence'

According to the "law of the case doctrine,"[31] "an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *U.S. v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (quoting *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002)). "The doctrine 'applies not only to issues decided explicitly, but also to everything decided by necessary implication." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 336-37 (5th Cir. 2007) (quoting *Office of Thrift Superv. v. Felt*, 255 F.3d 220, 225 (5th Cir. 2001)) (internal quotations omitted). "Although the law of the case does not absolutely bind later panels, [courts] will generally apply it unless (1) the evidence is materially different on later appeal; (2) there has been a change in controlling law on the applicable issues; or (3) the initial decision was clearly erroneous and adhering to it would result in manifest injustice." *Id.* Considering the fact that NNIC fails to establish that any of the three exceptions to the law of the case

---

was broad enough to encompass all conduct related to the Frierson murder investigation, including both Hale's actions while he was employed as a detective with the Sheriff's Office and his post-employment conduct during Burge's murder trial in 1986." *Id.*

[31]The "law of the case doctrine" "discourages opportunistic litigants from appealing repeatedly in hopes of obtaining a more sympathetic panel [of judges]." *U.S. v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). "Without this doctrine, cases would end only when obstinate litigants tire of re-asserting the same arguments over and over again." *Id.* "The doctrine of law of the case, in other words, is essential to the orderly administration of justice." *Id.*

doctrine are applicable,[32] the Court may not now reexamine the Fifth Circuit's finding.

## B. THE BURGE SETTLEMENT AGREEMENT

NNIC argues that even if the allegations in Burge's complaint triggered NNIC's duty to defend, NNIC was relieved of that duty because Burge, by virtue of signing a partial settlement and indemnification agreement on November 15, 2000,[33] released Hale from all liability arising from his acts occurring between September 1, 1980 and September 1, 1983.[34]  Therefore, to the extent that any of Hale's alleged conduct during 1980-1983 resulted in Burge's

---

[32]NNIC presents the same or similar argument with respect to this motion that it presented with respect to the motion for summary judgment before Judge Livaudais.

[33]The partial settlement and indemnification agreement signed by Burge provides, in pertinent part:
    IT IS FURTHER AGREED that payment of said SEVENTY-FIVE THOUSAND AND NO/100 ($75,000.00) DOLLARS, by Northwestern to Gerald Burge shall release, acquit, and discharge Patrick Canulette, individually and/or in his official capacity, his successors in office, any agent, insurer, and/or employee of Canulette in his official capacity (the Sheriff) and Gary Hale for all damages, costs, legal interest, and attorney's fees, **except punitive damages**, for any tortious act or conduct of the Sheriff, his successors in office, any agent or employee of Canulette in his official capacity which occurred between September 1, 1980 and September 1, 1983 and which may give rise to any legal liability to the Sheriff and/or Hale in favor of Burge during that time period for any claims by Burge for personal injury, false arrest, wrongful imprisonment, wrongful conviction, malicious prosecution, negligence, negligent and/or intentional infliction of emotional distress, spoliation of evidence, violation of civil rights and/or violation of Gerald Burge's rights under the laws of the State of Louisiana, United States, and/or United States Constitution including any other damage or injury of whatever nature or kind during that time period, except punitive damages, as well as any and all liability the Sheriff and/or Hale might have for costs and/or attorney's fees, or legal interest due to Burge as a result of any tortious or wrongful conduct by the Sheriff and/or Hale or any employee or agent of the Sheriff which occurred between September 1, 1980 and September 1, 1983.

Rec. Doc. No. 395-5 (emphasis added).

[34]Rec. Doc. No. 395-2, p. 7.

-19-

malicious prosecution and wrongful imprisonment, NNIC argues that Hale's release from liability relieved NNIC of any obligation that it may have had to continue to defend Hale.[35]

As noted by the Fifth Circuit, NNIC's argument with respect to the above-referenced settlement agreement is intertwined with the unresolved factual dispute concerning whether Hale's misconduct occurred during the amended ADIC policy's coverage period. *Stanley*, 500 F.3d at 429. Before the Court may determine whether Burge's settlement agreement released Hale from all claims covered by the amended ADIC policy, it must first determine the extent to which Burge's claims are based on Hale's misconduct during the policy's coverage period.

### C. __WHETHER HALE'S ACTIONS WERE INTENTIONAL__

NNIC alternatively argues that, even if Hale's conduct in 1986 is found to be covered by the amended ADIC policy by virtue of its relation back to Hale's conduct in 1980, NNIC had no duty to defend Hale during the Burge litigation because Burge alleged that Hale intentionally deprived him of his constitutional rights, and the amended ADIC policy excludes coverage for injuries or damages that were the "expected or intended" results of the insured's actions.[36]

---

[35]*Id.* at pp. 7-8.

[36]Rec. Doc. No. 431-3, p. 14.  The amended ADIC Policy defines "occurrence" in pertinent part as "an accident, including continuous or repeated exposure to conditions, which results in injury or damages **neither expected nor intended from the standpoint of the insured** . . . ."  *See* Rec. Doc. No. 409-5 "Amended ADIC Policy, Amendatory Endorsement No. 4" (emphasis added).

"The purpose of the intentional injury exclusion is to restrict liability insurance coverage by denying coverage to an insured in circumstances where the insured acts deliberately and intends or expects . . . injury to another.  The exclusion is 'designed to prevent an insured from acting wrongfully with the security of knowing that his insurance company will "pay the piper" for the damages.'"  *Breland v. Schilling*, 550 So. 2d 609, 610 (La. 1989) (*quoting Transam. Ins. Group v. Meere*, 694 P.2d 181, 186 (Ariz. 1984)).  The Louisiana Supreme Court noted that the phrase in the exclusion, "from the standpoint of the insured," leads to an inquiry into the subjective intention of the insured to determine which damage falls within and which falls outside the scope of the policy coverage.  *Id.* at 611.

"'The subjective intent of the insured, as well as his reasonable expectations as to the scope of his insurance coverage, will determine whether an act is intentional.  An act is intended if the perpetrator desires the results of his action or he believes that the results are substantially certain to occur.'"  *Pender v. Elmore*, 855 So. 2d 930, 936 (La. Ct. App. 2003) (quoting *Yount v. Masiano*, 627 So. 2d 148, 152 (La. 1993)).  If an insured knows and expects that damage will occur, but nevertheless acts, the expected incident is excluded under an insurance policy's expected or intended injury exclusion.  *Cole-Gill v. Moore*, 862 So. 2d 1197, 1205-06 (La. Ct. App. 2003).

-21-

With respect to Hale's alleged conduct in 1980, Burge's complaint is silent with respect to Hale's subjective intent and reasonable expectation as to the scope of any insurance coverage. The Court cannot definitively state that Burge's allegations concerning Hale's conduct in 1980 are "unambiguously excluded" from coverage pursuant to the "expected or intended" exclusion in the amended ADIC policy.

Moreover, Burge's allegations concerning Hale's conduct in 1986 are not unambiguously excluded from the policy's coverage. Burge alleged that in 1986, in connection with the Burge litigation, Hale and his co-defendants deliberately and intentionally and/or **negligently** failed to surrender exculpatory evidence to Burge as required by a court order.[37]  This allegation makes clear that Burge contemplated that Hale's failure to produce exculpatory evidence may have been negligent.  "By mere definition, negligence does not involve intent." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 353 (5th Cir. 2005).  Therefore, a negligence claim cannot be excluded by an "expected or intended" result exclusion.

NNIC also argues that, regardless of the allegations in Burge's complaint, NNIC had no duty to defend Hale during the Burge litigation because the jury in that case determined that Hale's

---

[37]Rec. Doc. No. 395-6, p. 9, para. 31.

actions were intentional.[38]   However, an insurer's duty to defend exists until the insurer can establish by undisputed facts that the insured's conduct is not covered.   *Allstate Ins. Co. v. Roy*, 653 So. 2d 1327, 1333 (La. App. 1 Cir. 1995); *see also Mossy*, 898 So. 2d at 607 ("[A]ssuming all the allegations of the petition to be true, if there would be both coverage under the policy and liability to the plaintiff, the insurer must defend the lawsuit **regardless of the outcome.**") (emphasis added).   There remains a genuine issue of material fact concerning whether NNIC was obligated to defend Hale **during** the Burge litigation.

### D. <u>POLICY COVERAGE LIMIT</u>

As previously stated, on September 1, 1981, the original ADIC policy was "canceled flat"[39] and amended.   Pursuant to the September 1, 1981, amendment, the policy coverage limit was increased from $100,000.00 per occurrence, less a $50,000.00 deductible, to $1,000,000.00 per occurrence, less a $50,000.00 deductible.

NNIC argues that the September 1, 1981, amendment did not apply retroactively and, as such, the policy coverage limit for covered events that occurred prior to the amendment remained

---

[38]Rec. Doc. No. 395-2, p. 15.

[39]"'Cancelled flat' is a term of art essentially meaning 'void ab initio.'" *See Stanley*, 500 F.3d at 417 n. 7 (citing *Highlands*, 373 F.3d at 350, n. 4; *Escobedo*, 930 P.2d at 985)("[A]ccording to insurance industry usage, a 'cancellation' may under some circumstances be made 'flat,' meaning effective from the policy's inception, eliminating liability for either premiums due or losses incurred in the interim.").

$100,000.00 per occurrence.[40]  NNIC argues that, in light of the fact that Hale's acts, if any, causing compensable damages under the policy occurred prior to the policy's amendment in 1981 and after the policy's expiration in 1983, the policy coverage limit applicable in this case is $100,000.00 per occurrence.[41]

Stanley responds by arguing that, in light of the fact that the original ADIC policy was "cancelled flat," the September 1, 1981 amendment increasing the per occurrence coverage to $1,000,000.00 should be interpreted to apply to all three years of the policy period.

Just as with the amended ADIC policy's coverage period, the Fifth Circuit agreed with Judge Livaudais' determination that there are genuine issues of material fact concerning the amended ADIC policy's coverage limit.[42]  *Stanley*, 500 F.3d at 429.  In light of the fact that NNIC fails to establish that any of the exceptions to the law of the case doctrine are applicable, the Court shall not

---

[40]Rec. Doc. No. 395-2, p. 20.

[41]*Id*.

[42]In the Burge litigation, Judge Livaudais determined that there were genuine issues of material fact concerning the amended ADIC policy's coverage limit.  *Stanley*, 500 F.3d at 416.  "The coverage limit issue concerned, *inter alia*, whether (1) marking the original ADIC Policy 'canceled flat' indicated an intention to make the terms of the amended ADIC Policy effective retroactively, or (2) the Louisiana Sheriff's Association has intended for the *original* ADIC Policy to provide a $1,000,000.00 coverage limit."  *Id*. at 416-17.
   The Court notes that NNIC argues that the only time the Fifth Circuit discusses the $1,000,000.00 policy in *Stanley* is in the "facts and proceedings" section of its opinion.  Rec. Doc. No. 431-3, p. 17.  However, NNIC is incorrect.  The Fifth Circuit clearly stated that Judge Livaudais previously determined that there are genuine issue of material fact concerning the policy's coverage limit and that the Fifth Circuit agreed with that determination.  *Stanley*, 500 F.3d at 429.

-24-

now reexamine the Fifth Circuit's finding.

Accordingly,

**IT IS ORDERED** that NNIC's motion for summary judgment is **DENIED.**

New Orleans, Louisiana, May 27th, 2008.

                                                    **LANCE M. AFRICK**
                                      **UNITED STATES DISTRICT JUDGE**